IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

ASHLEY NICOLE DAVIS,                    )
          Plaintiff,                    )
                                        )
          v.                            )          Civil No. 3:18cv461 (REP)
                                        )
ANDREW M. SAUL,[1]                      )
Commissioner of Social Security,        )
          Defendant.                    )
                                        )

REPORT AND RECOMMENDATION

On July 29, 2014, Ashley Nicole Davis ("Plaintiff") applied for Social Security Disability

Benefits ("DIB") and Supplemental Security Income ("SSI") under the Social Security Act

("Act"), alleging disability from narcolepsy with cataplexy, neurocardiogenic syncope, anxiety,

panic disorder and bipolar effective disorder, with an alleged onset date of June 28, 2014. The

Social Security Administration ("SSA") denied Plaintiff's claims both initially and upon

reconsideration. Thereafter, an Administrative Law Judge ("ALJ") denied Plaintiff's claims in a

written decision and the Appeals Council denied Plaintiff's request for review, rendering the

ALJ's decision as the final decision of the Commissioner.

Plaintiff now seeks judicial review of the ALJ's decision pursuant to 42 U.S.C. § 405(g),

arguing that the ALJ erred in: (1) failing to consider whether Plaintiff's impairments met or

medically equaled the criteria of Listing 11.03; (2) assigning "little weight" to the opinion of

---

[1]      On June 4, 2019, the United States Senate confirmed Andrew M. Saul to a six-year term
as the Commissioner of Social Security. Pursuant to Federal Rule of Civil Procedure 25(d),
Commissioner Saul should be substituted for former Acting Commissioner Nancy A. Berryhill
as the defendant in this matter.

Plaintiff's treating physician, Rakesh Sood, M.D.; and, (3) failing to account for Plaintiff's moderate limitations in concentration, persistence and pace in Plaintiff's Residual Functional Capacity ("RFC") assessment. (Mem. in Support of Pl.'s Mot. For Summ. J. ("Pl.'s Mem.") (ECF No. 13) at 5, 8, 10.) This matter now comes before the Court for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) on the parties' cross-motions for summary judgment, rendering the matter ripe for review.[2] For the reasons that follow, the Court recommends that Plaintiff's Motion for Summary Judgment or, in the Alternative, Motion for Remand (ECF No. 12) be DENIED, that Defendant's Motion for Summary Judgment (ECF No. 15) be GRANTED and that the final decision of the Commissioner be AFFIRMED.

## I.    PROCEDURAL HISTORY

On July 29, 2014, Plaintiff filed applications for DIB and SSI with an alleged onset date of June 28, 2014. (R. at 83, 93.) The SSA denied these claims initially on September 24, 2014, and again upon reconsideration on December 23, 2014. (R. at 86, 91, 112, 123.) At Plaintiff's written request, the ALJ held a hearing on September 28, 2016. (R. at 37.) Following the submission of additional medical interrogatories on December 29, 2016, the ALJ held a supplemental hearing on May 12, 2017. (R. at 63-81.) During the supplemental hearing, Plaintiff's counsel alerted the ALJ that Plaintiff recently attended an appointment with her treating physician; however, the ALJ never received the medical record for this appointment. (R. at 15-16, 64-67.) On June 27, 2017, the ALJ issued a written opinion, denying Plaintiff's claims

---

[2]    The administrative record in this case remains filed under seal, pursuant to E.D. Va. Loc. R. 5 and 7(C). In accordance with these Rules, the Court will endeavor to exclude any personal identifiers such as Plaintiff's social security number, the names of any minor children, dates of birth (except for year of birth), and any financial account numbers from its consideration of Plaintiff's arguments, and will further restrict its discussion of Plaintiff's medical information to only the extent necessary to properly analyze the case.

and concluding that Plaintiff did not qualify as disabled under the Act, because "considering [Plaintiff's] age, education, work experience, and residual functional capacity, [Plaintiff could make] a successful adjustment to other work that exists in significant numbers in the national economy." (R. at 29.)  On May 24, 2018, the Appeals Council denied Plaintiff's request for review, rendering the ALJ's decision as the final decision of the Commissioner subject to review by this Court.  (R. at 1-5.)

## II.   STANDARD OF REVIEW

In reviewing the Commissioner's decision to deny benefits, a court "will affirm the Social Security Administration's disability determination 'when an ALJ has applied correct legal standards and the ALJ's factual findings are supported by substantial evidence.'" *Mascio v. Colvin*, 780 F.3d 632, 634 (4th Cir. 2015) (quoting *Bird v. Comm'r of Soc. Sec. Admin.*, 699 F.3d 337, 340 (4th Cir. 2012)).  Substantial evidence requires more than a scintilla but less than a preponderance, and includes the kind of relevant evidence that a reasonable mind could accept as adequate to support a conclusion. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012); *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996).  Indeed, "the substantial evidence standard 'presupposes . . . a zone of choice within which the decision makers can go either way, without interference by the courts.  An administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision.'" *Dunn v. Colvin*, 607 F. App'x. 264, 274 (4th Cir. 2015) (quoting *Clarke v. Bowen*, 843 F.2d 271, 272-73 (8th Cir. 1988)).

To determine whether substantial evidence exists, the court must examine the record as a whole, but may not "undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [ALJ]." *Hancock*, 667 F.3d at 472

3

(quoting *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005)); *see also Biestek v. Berryhill*, 139 S. Ct. 1148, 1157 (2019) (holding that the substantial-evidence inquiry requires case-by-case consideration, with deference to the presiding ALJ's credibility determinations). In considering the decision of the Commissioner based on the record as a whole, the court must "take into account whatever in the record fairly detracts from its weight." *Breeden v. Weinberger*, 493 F.2d 1002, 1007 (4th Cir. 1974) (quoting *Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 488 (1951)). The Commissioner's findings as to any fact, if substantial evidence in the record supports the findings, bind the reviewing court to affirm regardless of whether the court disagrees with such findings. *Hancock*, 667 F.3d at 477. If substantial evidence in the record does not support the ALJ's determination or if the ALJ has made an error of law, the court must reverse the decision. *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

The Social Security Administration regulations set forth a five-step process that the agency employs to determine whether disability exists. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *see Mascio*, 780 F.3d at 634-35 (describing the ALJ's five-step sequential evaluation). To summarize, at step one, the ALJ looks at the claimant's current work activity. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i). At step two, the ALJ asks whether the claimant's medical impairments meet the regulations' severity and duration requirements. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). Step three requires the ALJ to determine whether the medical impairments meet or equal an impairment listed in the regulations. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). Between steps three and four, the ALJ must assess the claimant's residual functional capacity, accounting for the most that the claimant can do despite her physical and mental limitations. §§ 404.1545(a), 416.945(a). At step four, the ALJ assesses whether the claimant can perform her past work given her RFC. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv). Finally, at step five, the

ALJ determines whether the claimant can perform any work existing in the national economy.
§§ 404.1520(a)(4)(v), 416.920(a)(4)(v).

III.     THE ALJ'S DECISION

On September 28, 2016, the ALJ held a remote hearing during which Plaintiff
(represented by counsel) and a vocational expert ("VE") testified.  (R. at 37.)  Following the
submission of additional medical interrogatories from medical expert ("ME") Gerald Orth, M.D.,
on December 29, 2016, the ALJ held a supplemental hearing on May 12, 2017.  (R. at 63-82.)
On June 27, 2017, the ALJ issued a written opinion, finding that Plaintiff did not qualify as
disabled under the Act.  (R. at 15-29.)

The ALJ followed the five-step evaluation process established by the Social Security Act
in analyzing Plaintiff's disability claim.  (R. at 16-29.)  At step one, the ALJ found that Plaintiff
had not engaged in substantial gainful activity since her alleged onset date.  (R. at 18.)  At step
two, the ALJ determined that Plaintiff had the following severe impairments:  neurocardiogenic
syncope,[3] narcolepsy with cataplexy,[4] anxiety, panic disorder and bipolar affective disorder.  (R.
at 18.)  At step three, the ALJ found that Plaintiff did not have any impairment or combination of
impairments that met or medically equaled the severity of one of the listed impairments.  (R. at
19–20.).

In assessing Plaintiff's RFC, the ALJ found that Plaintiff had the residual capacity to
perform a full range of work at all exertional levels, but with some additional limitations.  (R. at

---

[3]     Neurocardiogenic syncope denotes a serious type of vasovagal syncope characterized by
pallor, nausea, sweating, bradycardia and rapid drops in arterial blood pressure, resulting in loss
of consciousness.  *Syncope*, Dorland's Illustrated Medical Dictionary (32d ed. 2012).

[4]     Patients with cataplexy experience abrupt attacks of muscular weakness and hypotonia,
most often triggered by emotional stimuli such as anger, fear or surprise.  *Cataplexy*, Dorland's
Illustrated Medical Dictionary (32d ed. 2012).

21.) Specifically, Plaintiff could only occasionally balance, stoop, kneel, crouch, crawl and climb ramps and stairs. (R. at 21.) Plaintiff could never climb ladders, ropes or scaffolds. (R. at 21.) Plaintiff could handle only occasional exposure to vibrations and no exposure to hazardous conditions, including unprotected heights and moving machinery. (R. at 21.) The ALJ limited Plaintiff to simple, routine tasks with occasional interaction with the general public. (R. at 21.) At step four, the ALJ found that Plaintiff could not perform any past relevant work. (R. at 27.) At step five, the ALJ determined that Plaintiff could perform jobs existing in significant numbers in the national economy, including work as a cleaner, food prep worker and mail clerk at a private company. (R. at 28-29.) Therefore, the ALJ concluded that Plaintiff did not qualify as disabled under the Act. (R. at 29.)

## IV.    ANALYSIS

Plaintiff, age twenty-eight at the time of this Report and Recommendation, previously worked as a certified nursing assistant. (R. at 28, 43, 305-312.) She applied for Social Security benefits, alleging disability from neurocardiogenic syncope, narcolepsy with cataplexy, anxiety, panic disorder and bipolar affective disorder, with an alleged onset date of June 28, 2014. (R. at 48-52, 83-91, 280-286, 312, 444-451, 505-506.) Plaintiff's appeal to this Court alleges that the ALJ erred in: (1) failing to consider whether Plaintiff's impairments met or medically equaled the criteria of Listing 11.03; (2) assigning "little weight" to the opinion of Plaintiff's treating physician, Dr. Sood; and, (3) failing to account for Plaintiff's moderate limitations in concentration, persistence and pace in Plaintiff's RFC assessment. (Pl.'s Mem. at 5, 8, 10.) For the reasons set forth below, the ALJ did not err in her decision.

6

**A.      The ALJ Did Not Err in Failing to Consider Listing 11.03 at Step Three.**

Plaintiff argues that the ALJ should have considered Dr. Sood's opinion that her impairments medically equaled the criteria of Listing 11.03.[5] (Pl.'s Mem. at 11.) Defendant responds that as of the date of Dr. Sood's opinion and the ALJ's decision, Listing 11.03 had lapsed, rendering Dr. Sood's opinion outdated. (Def.'s Mot. for Summ. J. & Br. in Supp. Thereof ("Def.'s Mem.") (ECF No. 15) at 13-15.) Defendant further argues that even with regard to the relevant listing in effect, Listing 11.02,[6] Plaintiff failed to meet her burden of proof to demonstrate that her impairments met or medically equaled the criteria of that Listing. (Def.'s Mem. at 21-22.)

Plaintiff bears the burden of proving that she meets or equals a listing. *Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987). The listings "were designed to operate as a presumption of disability that makes further inquiry unnecessary" and, consequently, require an exacting standard of proof. *Sullivan v. Zebley*, 493 U.S. 521, 532-33 (1990). "For a claimant to show that his impairment matches a listing, it must meet all of the specified medical criteria. An

---

[5]      Before undergoing revision in January 2017, Listing 11.03 stated the following: 11.03 Epilepsy — nonconvulsive epilepsy (petit mal, psychomotor, or focal), documented by detailed description of a typical seizure pattern, including all associated phenomena; occurring more frequently than once weekly in spite of at least 3 months of prescribed treatment. With alteration of awareness or loss of consciousness and transient postictal manifestations of unconventional behavior or significant interference with activity during the day.

*Eden v. Berryhill*, 2017 WL 1404380, at *15 (S.D. W. Va. Mar. 28, 2017), *report and recommendation adopted*, 2017 WL 1398341 (S.D.W. Va. Apr. 18, 2017) (quoting 20 C.F.R. § Pt. 404, Subpt. P, App. 1, § 11.03 (Jan. 1, 2015)).

[6]      "Although narcolepsy and epilepsy are not truly comparable illnesses, when evaluating medical severity, the closest listing to equate narcolepsy with is Listing 11.02, Epilepsy." Program Operations Manual Systems (POMS) DI24580.005, Evaluation of Narcolepsy, http://policy.ssa.gov/poms.nsf/lnx/0424580005 (last visited Feb. 21, 2019) (effective Sept. 26, 2016).

impairment that manifests only some of those criteria, no matter how severely, does not qualify." *Id.* at 530. The regulations reserve to the Commissioner the ultimate decision of whether a claimant qualifies as disabled under the Act. 20 C.F.R. §§ 404.1527(d)(1), 416.927(d)(1).

Here, as Defendant correctly points out, Listing 11.03 had lapsed both at the time of Dr. Sood's opinion (March 16, 2017) and at the time of the ALJ's decision (June 27, 2017). Indeed, as of September 29, 2016, Listing 11.02, which contains different criteria, replaced Listing 11.03. Revised Medical Criteria for Evaluating Neurological Disorders, 81 Fed. Reg. 43048, (July 1, 2016); (Def.'s Mem. at 19-20.) The listing change applied "to new applications filed on or after the effective date of the final rule and to claims that are pending on or after the effective date." *Id.* Thus, Dr. Sood's opinion regarding the equivalency of Plaintiff's impairments to Listing 11.03 proved irrelevant, because he relied on outdated and therefore invalid listing criteria.

As to the relevant listing in effect, Listing 11.02, the ALJ found that Plaintiff "show[ed] no evidence of an impairment [or combination of impairments] which me[t] or medically equal[ed] the criteria of a listed impairment [under listings 4.00 and 11.00]." (R. at 19.) In support of this conclusion, the ALJ cited to exhibits 6F and 10F, which included treatment records relevant to Plaintiff's narcolepsy and neurocardiogenic syncope. (R. at 19.) The ALJ also relied on the answers to medical interrogatories submitted by the ME, Dr. Orth, which opined that Plaintiff's conditions did not meet or equal any listing under 11.00 or 1.00. (R. at 19, 573.) The Court finds the ALJ's explanation regarding Listing 11.02 legally sufficient, as the ALJ cited to specific objective medical findings and other evidence in the record — namely, Dr. Orth's interrogatory answers — in support of her conclusion. Indeed, the Court's own review of

the record finds substantial support for the ALJ's finding that Plaintiff's impairments, either singly or in combination, failed to meet or medically equal the criteria of Listing 11.02.

Listing 11.02 requires evidence of epilepsy or an equivalent impairment with a detailed description of a typical seizure and evidence of either:

> A. Generalized tonic-clonic seizures (see 11.00H1a),[7] occurring at least once a month for at least 3 consecutive months (see 11.00H4)[8] despite adherence to prescribed treatment (see 11.00C);[9] or
>
> B. Dyscognitive seizures (see 11.00H1b),[10] occurring at least once a week for at least 3 consecutive months (see 11.00H4) despite adherence to prescribed treatment (see 11.00C); or
>
> C. Generalized tonic-clonic seizures (see 11.00H1a), occurring at least once every 2 months for at least 4 consecutive months (see 11.00H4) despite adherence

---

[7]     The listings define tonic-clonic seizures as "seizures . . . characterized by loss of consciousness accompanied by a tonic phase (sudden muscle tensing causing the person to lose postural control) followed by a clonic phase (rapid cycles of muscle contraction and relaxation, also called convulsions)." 20 C.F.R. Pt. 404, Subpt. P, App. 1, 11.00H1a.

[8]     The listings specify that the required number of seizures "must occur within the period [that the Commissioner is] considering in connection with [the claimant's] application or continuing disability review." 11.00H4. The listings further specify that: (a) multiple seizures within a 24-hour period count as one seizure; (b) a continuous series of seizures without return to consciousness between seizures counts as one seizure; (c) a dyscognitive seizure that progresses into a tonic-clonic seizure counts as one seizure; (d) seizures occurring during a period of noncompliance with prescribed treatment do not count without good reason for the noncompliance; and, (e) psychogenic nonepileptic seizures or pseudoseizures do not count for Listing 11.02 and are instead considered under 12.00. 11.00 H4(a)-(e).

[9]     The listings require that the "limitations from [epilepsy, parkinsonian syndrome or myasthenia gravis] exist despite adherence to prescribed treatment." 11.00C. "'Despite adherence to prescribed treatment' means that [the claimant has] taken medication(s) or followed other treatment procedures for [his or her] neurological disorder(s) as prescribed by a physician for three consecutive months" and his or her conditions continue to satisfy the criteria of one of the 11.00 listings. 11.00C.

[10]     Dyscognitive seizures denote "seizures . . . characterized by alteration of consciousness without convulsions or loss of muscle control." 11.00H1b. During a dyscognitive seizure, "blank staring, change of facial expression, and automatisms (such as lip smacking, chewing or swallowing, or repetitive simple actions, such as gestures of verbal utterances) may occur." 11.00H1b.

to prescribed treatment (see 11.00C); and a marked limitation in one of the following: 1. Physical functioning (see 11.00G3a); or 2. Understanding, remembering, or applying information (see 11.00G3b(i)); or 3. Interacting with others (see 11.00G3b(ii)); or 4. Concentrating, persisting, or maintaining pace (see 11.00G3b(iii)); or 5. Adapting and managing oneself (see 11.00G3b(iv));[11] or

D. Dyscognitive seizures (see 11.00H1b), occurring at least once every 2 weeks for at least 3 consecutive months (see 11.00H4) despite adherence to prescribed treatment (see 11.00C); and a marked limitation in one of the following: 1. Physical functioning (see 11.00G3a); or 2. Understanding, remembering, or applying information (see 11.00G3b(i)); or 3. Interacting with others (see 11.00G3b(ii)); or 4. Concentrating, persisting, or maintaining pace (see 11.00G3b(iii)); or 5. Adapting and managing oneself (see 11.00G3b(iv)).

20 C.F.R. Pt. 404, Subpt. P, App. 1, 11.02(A)-(D).

Here, as the ALJ correctly noted, the objective medical evidence from the relevant period failed to establish that Plaintiff's impairments, either singly or in combination, met or medically equaled the criteria of Listing 11.02. (R. at 19.) Indeed, records from after Plaintiff's alleged onset date of June 28, 2014 recorded improvement in Plaintiff's syncope and narcolepsy following prescribed treatment. (R. at 370 (noting in October 2014 that Plaintiff had experienced no episodes of syncope since starting medicative treatment), 398 (noting in December 2014 that Plaintiff had no reports of dizziness or fainting), 438 (noting in April 2015 that Plaintiff felt better overall and had "not [had] any episodes of actual syncope" since starting Prozac), 446 (reporting in July 2016 that Plaintiff exhibited normal mental functioning after starting

---

[11]    The listings differentiate between marked limitations in physical functioning and marked limitations in mental functioning. 11.00G2a-b. To have a marked limitation in physical functioning, a claimant must be "seriously limited in [his or her] ability to independently initiate, sustain, and complete work-related physical activities . . . such as standing, balancing, walking, using both upper extremities for fine and gross movements, [or] using one upper and one lower extremity." 11.00G2a. The Commissioner must consider "the overall effects of [a claimant's] neurological symptoms on the claimant's ability to perform such physical activities on a consistent and sustained basis." 11.00G2a. To find a marked limitation in mental functioning, a claimant must present evidence that "due to the signs and symptoms of [his or her] neurological disorder, [he or she is] seriously limited in the ability to function independently, appropriately, effectively, and on a sustained basis in work settings." 11.00G2b.

Seroquel), 450 (noting in April 2016 that Plaintiff had no reported loss of consciousness, dizziness, memory lapses or changes, loss of balance or falls).)  In August 2016, Plaintiff also responded "No" to the question, "Do you fall asleep during the day enough to affect your personal life and responsibilities?"  (R. at 463.)  And, when Plaintiff's treating physician instructed her to taper off of Xanax and start a prescription of Xyrem to treat her narcolepsy, Plaintiff ignored her physician's instructions and continued to take Xanax, failing to follow prescribed treatment as required by Listing 11.02.  (*Compare* R. at 549 (instructing Plaintiff in October 2016 to taper off Xanax and start Xyrem and also prescribing Adderall XR 20mg), *with* R. at 65-66,73 (Plaintiff testifying during May 2017 supplemental hearing that she still took Xanax and did not follow up with her narcolepsy doctor until March 2017).)  Importantly, nowhere in the objective medical records from the relevant period does the Court find any evidence of periods of lost consciousness of the type, frequency and degree required by Listing 11.02.

Moreover, as the ALJ correctly noted, Dr. Orth's answers to the medical interrogatories found that Plaintiff failed to meet any of the 11.00 listings, including Listing 11.02.  (R. at 19, 573.)  Together, the opinion of Dr. Orth and the objective medical evidence clearly supported the ALJ's findings regarding Listing 11.02, and Dr. Sood's opinion regarding the outdated Listing 11.03 proved irrelevant to the ALJ's conclusions.[12]  Accordingly, the Court finds no grounds for remand.

---

[12]   To the extent that Plaintiff argues that the substance of Dr. Sood's opinion supports her qualification under Listing 11.02, the Court notes that substantial evidence review does not require remand simply because substantial evidence supports a conclusion opposite to that of the ALJ.  *Dunn*, 607 F. App'x. at 274.  Because substantial evidence supports the ALJ's conclusion regarding Listing 11.02, the Court finds no grounds for remand.  Moreover, the ALJ had no obligation to accept a physician's opinion that Plaintiff qualified as disabled under any listing, as the regulations reserve such a determination solely to the Commissioner.  20 C.F.R.

**B.     The ALJ Properly Assigned Little Weight to the Opinion of Dr. Sood and Substantial Evidence Supports the Weight Assigned.**

Plaintiff argues that the ALJ erred in assigning little weight to the opinion of her treating physician, Dr. Sood.  (Pl.'s Mem. at 5.)  Specifically, Plaintiff contends that the ALJ relied on unpersuasive contradictory evidence to support the assignment of little weight to Dr. Sood's treating physician opinion, including:  (1) Dr. Sood's failure in his treatment notes to indicate the efficacy of Plaintiff's medications; (2) Plaintiff's own statements regarding the severity of her symptoms; and, (3) Dr. Sood's October 2016 report that Plaintiff appeared "alert" despite being tired.[13]  (Pl.'s Mem. at 5-8.)  Defendant responds that substantial evidence supports the ALJ's assignment of weight to Dr. Sood's opinion.  (Def.'s Mem. at 13-15.)

During the sequential analysis, when the ALJ determines whether the claimant has a medically-determinable severe impairment, or combination of impairments, that would significantly limit the claimant's physical or mental ability to do basic work activities, the ALJ must analyze the claimant's medical records that are provided and any medical evidence resulting from consultative examinations or medical expert evaluations that have been ordered. 20 C.F.R. §§ 404.1512, 404.1527, 416.912, 416.927.  When the record contains a number of different medical opinions, including those from Plaintiff's treating sources, consultative examiners or other sources that are consistent with each other, then the ALJ makes a determination based on that evidence.   §§ 404.1527(c), 416.927(c).  If, however, the medical

---

§§ 404.1527(d)(1), 416.927(d)(1).

[13]     The ALJ's opinion incorrectly references an appointment with Dr. Sood in November 2016.  (R. at 23.)  Plaintiff's medical records show an appointment with Dr. Sood on October 28, 2016, and no appointments during November.  (R. at 547-49.)  The incorrect date proves inconsequential to the ALJ's analysis.

opinions are inconsistent internally with each other or other evidence, the ALJ must evaluate the opinions and assign them respective weight to properly analyze the evidence involved. §§ 404.1527(c)(2)-(6), (d), 416.927(c)(2)-(6), (d).

Under the regulations, only an "acceptable medical source" may be considered a treating source that offers an opinion entitled to controlling weight.  SSR 06-3p.[14]  Acceptable medical sources include licensed physicians, licensed or certified psychologists and certain other specialists, depending on the claimed disability.  §§ 404.1513(a), 404.1527(a), 416.913(a), 416.927(a).  The regulations also provide for the consideration of opinions from "other sources," including nurse-practitioners, physician's assistants or therapists.  SSR 06-03p; §§ 404.1527(f), 416.927(f).[15]  Under the applicable regulations and case law, a treating source's opinion must be given controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the record. §§ 404.1527(c)(2), 416.927(c)(2); *Lewis v. Berryhill*, 858 F.3d 858, 867 (4th Cir. 2017); *Craig*, 76 F.3d at 590; SSR 96-2p.  Further, the regulations do not require that the ALJ accept opinions from a treating source in every situation, *e.g.*, when the source opines on the issue of whether the claimant is disabled for purposes of employment (an issue reserved for the Commissioner), or

---

[14]    Effective March 27, 2017, the SSA rescinded SSR 96-2p and 06-3p, instead incorporating some of the Rulings' policies into 20 C.F.R. §§ 404.1527(f), 416.927(f).  82 Fed. Reg. 5844-01, at 5844-45, 5854-55 (Jan. 18, 2017).  Plaintiff filed her claims on July 29, 2014, before this regulation took effect.  (R. at 83, 93.)  The Agency does not have the power to engage in retroactive rulemaking.  *Compare Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988) (requiring Congress to expressly convey the power to promulgate retroactive rules due to its disfavored place in the law), *with* 42 U.S.C. § 405(a) (granting the Agency the general power to make rules, but not granting retroactive rulemaking power).  Because the regulation does not have retroactive effect, SSR 06-03p applies to Plaintiff's claims.

[15]    The regulations detail that "other sources" include medical sources that are not considered "acceptable medical sources" under 20 C.F.R. §§ 404.1527(f) and 416.927(f).  The given examples are a non-exhaustive list.  SSR 06-03p.

13

when the treating source's opinion is inconsistent with other evidence or when it is not otherwise well-supported.  §§ 404.1527(c)(3)-(4), (d), 416.927(c)(3)-(4), (d).

Courts generally should not disturb an ALJ's decision as to the weight afforded a medical opinion absent some indication that the ALJ "dredged up 'specious inconsistences.'" *Dunn v. Colvin*, 607 F. App'x 264, 267 (4th Cir. 2015) (citing *Scivally v. Sullivan*, 966 F.2d 1070, 1077 (7th Cir. 1992)).  Indeed, an ALJ's decision regarding weight afforded a medical opinion should be left untouched unless the ALJ failed to give a sufficient reason for the weight afforded.  *Id.*

The ALJ must consider the following when evaluating a treating source's opinion:  (1) the length of the treating source relationship and frequency of examination; (2) the nature and extent of the treatment relationship; (3) supportability based upon the medical record; (4) consistency between the opinion and the medical record; (5) any specialization on the part of the treating source; and, (6) any other relevant factors.  §§ 404.1527(c), 416.927(c).  However, those same regulations specifically vest the ALJ — not the treating source — with the authority to determine whether a claimant is disabled as that term is defined under the Act.  §§ 404.1527(d)(1), 416.927(d)(1).  Although the regulations explicitly apply these enumerated factors only to treating sources, those same factors may be applied in evaluating opinion evidence from "other sources."  SSR 06-03p.

Here, the ALJ properly assigned little weight to the medical opinion of Plaintiff's treating physician, Dr. Sood, and offered sufficient reasoning for the weight assigned.  (R. at 27.)  Dr. Sood, a neurologist and psychiatrist at the Sleep Disorder Center at Southern Virginia Regional Medical Center, treated Plaintiff for depression and anxiety every two to three months between April 2016 and March 2017 (although Plaintiff missed an appointment in December

2016), and treated Plaintiff for narcolepsy with cataplexy following Plaintiff's diagnosis in August 2016. (R. at 64-66, 70-71, 444-451, 483-84, 547-49.)

On March 16, 2017, Dr. Sood completed a Sleep Disorders RFC Questionnaire. (R. at 574-77.) On the Questionnaire, Dr. Sood reported that Plaintiff had narcolepsy with cataplexy, with six to seven attacks per day, sleeping two to four hours with each attack. (R. at 574.) Dr. Sood opined that Plaintiff's condition would constantly interfere with her ability to pay attention and concentrate, and that if placed in a competitive job, Plaintiff would be unable to handle exposure to the public; routine, repetitive tasks at a consistent pace; detailed or complicated tasks; strict deadlines; close interaction with co-workers/supervisors; fast-paced tasks; exposure to work hazards; and, driving. (R. at 575.) Dr. Sood noted that Plaintiff experienced side effects from her medications, including drowsiness, sedation, headaches and shaking. (R. at 575.) Dr. Sood opined that Plaintiff should avoid all exposure to power tools and concentrated or even moderate exposure to heights and dangerous machinery. (R. at 576.) Dr. Sood also precluded Plaintiff from working alone without supervision and performing routine and repetitive tasks. (R. at 576.) Dr. Sood further opined that, as a result of her impairments, Plaintiff likely would be absent from work more than five days a month on average. (R. at 576-77.) And Dr. Sood opined that Plaintiff's impairments proved at least as medically severe as the definition of epilepsy under Listing 11.03. (R. at 577.) Dr. Sood did not address how long Plaintiff could sit and stand/walk during an eight-hour workday, how many times during an average workday Plaintiff would need to take unscheduled breaks, how long Plaintiff would need to return to work or what symptoms caused her need for breaks. (R. 575-76.)

In affording Dr. Sood's opinion little weight, the ALJ stated that the opinion "[was] not consistent with [Dr. Sood's] own treatment notes . . . [or] claimant's own written response

denying that her daytime sleepiness interferes enough to affect her personal life and responsibilities." (R. at 27, 463.) The ALJ explained that Dr. Sood's treatment notes failed to discuss the efficacy of Plaintiff's current medications, whether working or not. (R. at 27.) The ALJ also noted that Plaintiff appeared alert, oriented and cooperative during her mental status examinations in April, July and October 2016. (R. at 27, 446, 450, 549.) Specifically, the ALJ pointed to Dr. Sood's observation from October 2016 that "while [Plaintiff] was tired, she was still alert." (R. at 27, 549.) Ultimately, the ALJ provided adequate reasoning for assigning little weight to Dr. Sood's opinion, citing to specific evidence in the record to support her findings. Importantly, substantial evidence, including Plaintiff's medical records, reported activities and testimony, support the ALJ's assignment of weight.

### 1. *Plaintiff's Objective Medical Records Support the ALJ's Assignment of Little Weight to Dr. Sood's Opinion.*

As the ALJ correctly noted, Dr. Sood's RFC opinion suggested that Plaintiff suffered from more extreme limitations than his own examinations and reports indicated and proved inconsistent with the medical evidence of record overall. (R. at 27.) Indeed, although Dr. Sood opined that Plaintiff experienced constant interference with her ability to pay attention and concentrate, Dr. Sood's treatment notes repeatedly recorded normal attention and concentration. (R. at 359, 362, 372, 440, 446-47, 450-51, 548-49.) In fact, aside from occasional dizziness and anxiety, Plaintiff's medical records spanning back to 2010 reported normal neurological testing and revealed little to no deficiencies in Plaintiff's attention or concentration. (R. at 359, 372, 411-14, 417, 419, 422, 440.) Further, although Dr. Sood's opinion stated that Plaintiff had six to seven attacks of narcolepsy each lasting two to four hours, as the ALJ correctly noted, in August 2016 — only seven months before Dr. Sood's opinion — Plaintiff self-reported that she did not fall asleep enough to affect her personal life and responsibilities. (R. at 27, 463.)

16

Moreover, to the extent that Plaintiff challenges the persuasiveness of the specific pieces of evidence emphasized by the ALJ, the Court finds such arguments unpersuasive. (Pl.'s Mem. at 5-8.) Indeed, courts have sustained an ALJ's reasoning when, as here, the ALJ noted the absence of evidence indicating that a claimant's medications proved ineffective. *See, e.g., Rogers v. Barnhart*, 204 F. Supp. 2d 885, 888-89 (W.D.N.C. 2002) (rejecting the plaintiff's argument that the ALJ improperly "rest[ed] on the absence of objective proof of pain," in part, because the ALJ could rely on the absence of evidence indicating that the plaintiff's medications proved ineffective to support his arguments (internal quotations omitted)). And the absence of evidence suggesting ineffective medications proves even more relevant when, as here, a claimant reports improvement in her symptoms under various medications, which the ALJ correctly noted elsewhere in her opinion. (R. at 23, 357-59, 389-95, 438-41.)

Likewise, the Court finds unconvincing Plaintiff's contention that the ALJ ignored the greater weight of the evidence when she singled out Dr. Sood's October 2016 notes indicating that "while [Plaintiff] was tired, she was still alert." (R. at 27, 549.) Although the ALJ pointed to evidence from one mental health status examination, the examination constituted the most recent findings by Dr. Sood before issuing his opinion and, as mentioned, the remainder of Dr. Sood's treatment notes also indicated that Plaintiff appeared alert and oriented. (R. at 359, 362, 372, 381, 384, 440, 446-47, 450-51, 548-49.)

Neither does the Court find grounds for remand in the ALJ emphasizing Plaintiff's negative response to the question of whether her conditions affected her personal life. (R. at 27; Pl.'s Mem. at 7-8.) Although Plaintiff's counsel argues that this response, in light of Plaintiff's other statements suggesting that she always felt fatigued and sleepy throughout the day, only highlighted Plaintiff's "poverty of understanding" as to the extent of her limitations, (Pl.'s Mem.

at 7-8), the Court finds no legal grounds to require an ALJ to guess whether a claimant meant what she said in a treatment record.

Put simply, Plaintiff's piecemeal attack on the evidence emphasized by the ALJ fails to undermine or contradict the ALJ's narrative explanation regarding the overall inconsistencies between Dr. Sood's opinion and his own treatment notes — an explanation that the evidence of record clearly supports.

### 2. *Plaintiff's Own Statements Contradicted Dr. Sood's Opinion.*

The ALJ also found inconsistencies between Dr. Sood's opinion and Plaintiff's testimony regarding her daily activities. (R. at 27.) For example, Plaintiff testified during her hearing that she helped her two children do their homework, washed their hair, read to them and went outside to watch them play. (R. at 50-52.) Plaintiff also cared for her son who has a seizure disorder. (R. at 51.) Plaintiff made simple meals for herself and her children, vacuumed, took the trash out, washed dishes and did other household chores. (R. at 50-51, 85, 117.) And Plaintiff testified that, although she avoided driving at the advice of her doctor, she went grocery shopping when someone else drove her. (R. at 52.)

As the ALJ correctly noted, these reported daily activities contradicted Dr. Sood's severely restrictive limitations, including his statement that Plaintiff experienced six to seven attacks of narcolepsy per day, each lasting two to four hours. (R. at 27, 463.) Based on Dr. Sood's calculus, Plaintiff would be asleep for, at a minimum, twelve hours per day, excluding sleep during the night. (R. at 27, 463, 574.) Such frequent and extensive periods of sleep do not accord with Plaintiff's reported daily activities, providing further support for the ALJ's assignment of little weight to Dr. Sood's opinion.

Undoubtedly, Dr. Sood's own treatment notes, the other objective evidence of record and Plaintiff's own statements regarding her activities of daily living proved inconsistent with the severely restrictive limitations endorsed by Dr. Sood. Because the ALJ explained herself in accounting for these inconsistencies and the evidence of record supports the ALJ's explanation, the Court finds no grounds for remand.

### C. The ALJ's RFC Assessment Properly Accounted for Plaintiff's Moderate Limitations in Maintaining Concentration, Persistence and Pace.

Citing to *Mascio v. Colvin*, Plaintiff argues that the ALJ's RFC assessment failed to adequately account for Plaintiff's moderate limitations in maintaining concentration, persistence and pace. (Pl.'s Mem. at 8-9.) In *Mascio*, the Fourth Circuit stressed the distinction between the ability to perform simple tasks and the ability to stay on task. 780 F.3d at 638. Only a RFC assessment that includes the latter limitation sufficiently reflects a claimant's difficulties with concentration, persistence and pace. *Id.* Plaintiff argues that this case requires remand, because: (1) the ALJ's RFC, which restricted Plaintiff to simple, routine tasks with only occasional interaction with the public, failed to account for Plaintiff's moderate limitations in maintaining concentration, persistence and pace; and, (2) the ALJ erred by failing to explain how Plaintiff's restriction to only occasional contact with the general public accounted for her inability to stay on task for an entire workday. (Pl.'s Mem. at 8-10.) Defendant responds that the ALJ satisfied *Mascio* by considering all relevant evidence and adequately explaining why Plaintiff's moderate limitations in maintaining concentration, persistence and pace did not translate into greater RFC limitations. (Def.'s Mem. at 16-19.)

After step three of the analysis, but before deciding whether a claimant can perform past relevant work at step four, the ALJ must determine the claimant's RFC. 20 C.F.R.

§§ 404.1520(e)-(f), 404.1545(a)(1), 416.920(e)-(f), 416.945(a)(1).  In analyzing a claimant's

abilities, an ALJ must first assess the nature and extent of the claimant's physical and mental

limitations and then determine the claimant's RFC for work activity on a regular and continuing

basis.  §§ 404.1545(b), 416.945(b).  Generally, the claimant bears the responsibility to provide

the evidence that the ALJ utilizes in making his RFC determination; however, before making a

determination that a claimant is not disabled, the ALJ must develop the claimant's complete

medical history, including scheduling consultative examinations if necessary.  §§ 404.1545(a)(3),

416.945(a)(3).  The RFC must incorporate impairments supported by the objective medical

evidence in the record and those impairments that are based on the claimant's credible

complaints.  §§ 404.1545(e), 416.945(e).  The ALJ must conduct a function-by-function analysis

in assessing a claimant's RFC, and remand may be appropriate in cases where the ALJ fails to

assess a claimant's capacity to perform relevant functions, or where the ALJ's analysis contains

inadequacies that frustrate meaningful review.  *Mascio*, 780 F.3d at 635-36.  The assessment

must include a narrative discussion of how the evidence supports each conclusion, citing specific

medical facts and non-medical evidence, including daily activities and observations.  SSR 96-8p.

In *Mascio*, the ALJ neglected to discuss the claimant's ability to perform certain

functions for a full workday — a troubling omission in light of conflicting evidence in the

record.  *Id.* at 637.  The Fourth Circuit remanded, because the ALJ's opinion lacked the analysis

required for a meaningful review and left the court "guess[ing] about how the ALJ arrived at her

conclusion . . . ."  *Id.* at 636-37.

An ALJ satisfies *Mascio* by "providing a detailed discussion of Plaintiff's capacity for

concentration, persistence, or pace."  *See Thomas v. Colvin*, 2016 WL 1070826, at *4 (E.D. Va.

Mar. 16, 2016) (finding *Mascio* satisfied because substantial evidence supported the RFC and

finding no inconsistency in the ALJ's assessment of the plaintiff's concentration, persistence or pace limitations).  Multiple courts within the Fourth Circuit have held that the ALJ's RFC assessment satisfies *Mascio* so long as it provides a detailed discussion of the plaintiff's capacity to maintain concentration, persistence and pace.  *See, e.g.*, *Sizemore v. Colvin*, 2016 WL 483140, at *3 (W.D.N.C. Feb. 5, 2016) (holding that the ALJ satisfied *Mascio* because he specifically explained how the plaintiff's limitations translated into work limitations); *Mitchell v. Colvin*, 2015 WL 5690899, at *5-7 (W.D. Va. Sept. 28, 2015) (distinguishing *Mascio*, because the ALJ relied on medical evidence to support his conclusion and did not summarily conclude that a limitation of simple, unskilled work accounted for the plaintiff's moderate impairment in concentration, persistence and pace); *St. Clair v. Colvin*, 2015 WL 5310777, at *6 (W.D. Va. Sept. 11, 2015) (finding that an RFC assessment relying on medical opinion evidence that the plaintiff could "perform simple and repetitive tasks and maintain regular attendance in the work place," despite having moderate impairment in concentration, satisfied *Mascio*).

These cases establish that *Mascio* did not create a *per se* rule that a plaintiff's moderate impairments in concentration, persistence or pace always translates into an RFC limitation. *Mitchell*, 2015 WL 5690899, at *7; *see also Mascio*, 780 F.3d at 638 (explaining that an ALJ could find that a claimant's limitations in concentration, persistence or pace do not affect that claimant's ability to work, so long as the ALJ explains why).  Rather, *Mascio* highlighted the ALJ's duty to review the evidence and explain his decision when the claimant has moderate limitations in concentration, persistence or pace.  780 F.3d at 638.  The Court finds that the ALJ did just that.

1.   *The ALJ's Discussion of Plaintiff's Moderate Limitations in Concentration, Persistence and Pace Satisfies* Mascio.

At step three, the ALJ found that "[w]ith regard to concentrating, persisting, or maintaining pace, [Plaintiff] has moderate limitations." (R. at 20.)  To support this finding, the ALJ drew upon Plaintiff's function report and testimony, noting that although Plaintiff reported in August 2016 that her memory had worsened and she had difficulty concentrating, Plaintiff also testified that she helped her children with their homework, read to them and fed them.  (R. at 20.)  The ALJ acknowledged that Plaintiff testified to experiencing severe anxiety and panic attacks, but the ALJ also observed that Plaintiff's treating psychiatrist "consistently noted that [her] memory was intact, her behavior was cooperative and calm, and that she was alert and oriented."  (R. at 20.)  The ALJ explained that Plaintiff's reported daily activities, together with the treatment notes of her treating psychiatrist, suggested that in regard to concentration, persistence and pace, Plaintiff "ha[d] no more than moderate limitations."  (R. at 20.)

After considering Plaintiff's symptoms based on the objective medical evidence and opinion evidence, the ALJ concluded that Plaintiff's RFC limited her to simple, routine tasks with occasional interaction with the general public.  (R. at 21.)  The ALJ acknowledged that Plaintiff's medical conditions were severe, but concluded that Plaintiff's impairments were "well accommodated" by the non-exertional RFC.  (R. at 24.)  The ALJ explained that by limiting Plaintiff to no exposure to hazardous conditions, never climbing ladders, ropes or scaffolds, and generally occasional postural limitations, the RCF "generously" accounted for Plaintiff's subjective complaints of weakness and fatigue from her medications' side effects, headaches, difficulty staying awake during the day and neurocardiogenic syncope, which appeared largely controlled by medication.  (R. at 24.)   In accommodating Plaintiff's alleged problems with

22

attention, concentration, memory and being around others, the ALJ limited Plaintiff to simple routine tasks and occasional interaction with the public.  (R. at 24.)

In support of her RFC assessment, the ALJ explained the inconsistencies between Plaintiff's testimony regarding the intensity, persistence and limiting effects of her symptoms and the medical record.  (R. at 24-25.)  First, while discussing Plaintiff's testimony regarding the severity of her narcolepsy symptoms, the ALJ noted that Plaintiff had not returned to see Dr. Sood since March 2017 and had missed her December appointment.  (R. at 24.)  The ALJ again highlighted Plaintiff's response to the August 2016 Sleep Study Questionnaire, in which Plaintiff responded "No" to the question "Do you fall asleep during the day enough to affect your personal life and responsibilities?"  (R. at 24-25, 527.)

Second, the ALJ discussed Plaintiff's allegations of severe depression and anxiety, noting that before the hearing, Plaintiff had only noted "occasional depression."  (R. at 25.)  The ALJ also pointed out that Plaintiff's psychiatrist generally noted only mild depression and mild anxiety.  (R. at 25.)  The ALJ then emphasized that, although Plaintiff's psychiatrist recommended that she see a therapist, Plaintiff attended counseling only once, citing a problem with "talking about her feelings," which contradicted her original testimony that her psychiatrist provided her with counseling.  (R. at 25, 55.)

Third, the ALJ discussed Plaintiff's syncopal symptoms, noting inconsistencies between Plaintiff's testimony during her first hearing that the rescue squad had attended to her several times after syncopal episodes at work and rescue squad records that listed only one instance of syncope.  (R. at 25, 44-46, 498-500.)  The ALJ further noted inconsistencies between Plaintiff's original testimony that her employer had given her written notices for missing so much work and

her later testimony that her employer had given her only verbal, not written, notices regarding her absences.  (R. at 25, 68.)

Finally, the ALJ discussed Plaintiff's reported daily activities, such as living alone, going grocery shopping with her grandmother and caring for her minor children, including reading to them and helping them with their homework.  (R. at 25.)  The ALJ explained that these activities, coupled with the inconsistencies detailed above, "indicate[d that Plaintiff] is capable of much more than she alleges, and supports the limitations outlined in the [RFC]."  (R. at 25.)

Although Plaintiff claims that *Mascio* unequivocally established that "an ALJ does not account for a moderate limitation in [concentration, persistence and pace] by restricting a claimant to simple, routine tasks," (Pl.'s Mem. at 9), Plaintiff mischaracterizes precedent. *Mascio* requires the ALJ to sufficiently explain her decision when the claimant has moderate limitation in concentration, persistence and pace — it does not mandate a particular RFC conclusion.  *See Sizemore*, 2016 WL 483140, at *3 (finding ALJ's explanation regarding the plaintiff's mental limitations sufficient, because ALJ's explanation followed *Mascio*'s requirement that an ALJ explain how a claimant's mental limitations translated or did not translate into the claimant's RFC).  In accordance with *Mascio*, the ALJ here engaged in a detailed discussion regarding Plaintiff's moderate limitations in concentration, persistence and pace.  The ALJ modified the RFC to accommodate both the subjective and objective evidence of Plaintiff's conditions found in her testimony, medical records and activities of daily living. Additionally, the ALJ pointed to inconsistencies between Plaintiff's allegations of the severity of her symptoms and other evidence in the record and described why those inconsistencies detracted from Plaintiff's credibility.  Because the ALJ properly explained why her findings regarding Plaintiff's moderate limitations in concentration, persistence and pace translated into

24

RFC limitations of simple routine tasks with occasional interaction with the public, *Mascio* does not warrant remand in this case.

### 2.    *Substantial Evidence Supports the ALJ's Findings Regarding Plaintiff's Ability to Maintain Concentration, Persistence and Pace.*

Importantly, not only does the ALJ's explanation regarding Plaintiff's limitations accord with the mandate of *Mascio* that an ALJ explain herself in accounting for a claimant's ability to maintain concentration, persistence and pace, substantial evidence also supports the ALJ's RFC findings regarding Plaintiff's mental abilities.  Indeed, as the ALJ correctly noted, despite Plaintiff's complaints of worsening memory, Plaintiff received limited and conservative treatment for her mental conditions in the form of medication.  (R. at 71-73, 80.)  Plaintiff's medical records also recorded normal attention and memory and generally normal mental status examinations.  (R. at 23-24, 359, 372, 381, 384, 440, 446, 450-51, 549.)  The ALJ further emphasized that Plaintiff's treating psychiatrist "consistently noted that [her] memory was intact, her behavior was cooperative and calm, and that she was alert and oriented" — a finding that the record supports.  (R. at 20, 359, 372, 381, 384, 440, 446, 450-51, 549.)  And the ALJ correctly observed that, by April 2015, Plaintiff reported no depression, hallucinations, dizziness or memory loss and that she felt better after starting Prozac and Xanax, suggesting less severe mental impairments than Plaintiff endorsed.  (R. at 23, 357-59, 389-95, 398-400, 438-41.)

Plaintiff's reported daily activities also supported the ALJ's conclusion that Plaintiff did not suffer from more severe limitations in concentration, persistence and pace.  Although Plaintiff reported in August 2016 that she experienced difficulty concentrating and worsening memory, (R. at 463), Plaintiff also testified that, with occasional assistance from her family, she went grocery shopping with her grandmother, helped her children with their homework, read to her children, fed them and washed their hair.  (R. at 20, 48-52.)  Plaintiff further testified that she

could sometimes perform household chores, such as cleaning and cooking. (R. at 48.) Finally, as the ALJ pointed out, although Plaintiff testified during her supplemental hearing that she experienced severe depression and anxiety, Plaintiff missed her December 2016 appointment with Dr. Sood, and did not follow up with him until March 2017, failing in the meantime to see a therapist as Dr. Sood recommended. (R. at 24, 55, 65-66, 73, 451.)

Plaintiff's medical records, coupled with her testimony and admitted activities of daily living, supported the ALJ's findings regarding Plaintiff's moderate limitations with concentration, persistence and pace. Accordingly, the Court finds no grounds for remand.

## V. CONCLUSION

For the reasons set forth above, the Court recommends that Plaintiff's Motion for Summary Judgment or, in the Alternative, Motion for Remand (ECF No. 12) be DENIED, that Defendant's Motion for Summary Judgment (ECF No. 15) be GRANTED and that the final decision of the Commissioner be AFFIRMED.

Let the Clerk forward a copy of this Report and Recommendation to Senior United States District Judge Robert E. Payne and all counsel of record.

## NOTICE TO PARTIES

**Failure to file written objections to the proposed findings, conclusions and recommendations of the Magistrate Judge contained in the foregoing report within fourteen (14) days after being served with a copy of this report may result in the waiver of any right to a de novo review of the determinations contained in the report and such failure shall bar you from attacking on appeal the findings and conclusions accepted and adopted**

**by the District Judge except upon grounds of plain error.**

_____ /s/

David J. Novak
United States Magistrate Judge

Richmond, Virginia
Date:  June 25, 2019